UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


Gloria Ann Young

     v.                          Civil No. 10-cv-417-JL
                                      Opinion No. 2011 DNH 140

Michael J. Astrue, Commissioner,
Social Security Administration


**MEMORANDUM ORDER**

This is an appeal from the denial of a claimant's application for Social Security Disability Benefits. See 42 U.S.C. § 405(g). The claimant, Gloria Ann Young, contends that the administrative law judge ("ALJ") incorrectly found that although Young suffered from diabetes and obesity, Admin. R. 9;[1] see 20 C.F.R. §§ 404.1520 (a),(c), she retained the residual functional capacity[2] ("RFC") to perform light work, Admin. R. 11; see 20 C.F.R. § 404.1567(b), and that she remained capable of performing her past work as a companion, day care assistant, and

---

[1] The court will reference the administrative record ("Admin. R.") to the extent that it recites facts contained in or directly quotes documents from the record. Cf. Lalime v. Astrue, No. 08-cv-196-PB, 2009 WL 995575, at *1 (D.N.H. Apr. 14, 2009).

[2] "Residual Functional Capacity" is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

teacher's assistant.  Admin. R. 15; <u>see</u> 20 C.F.R. §

404.1520(a)(4)(iv).  Young contends that the ALJ erred in

formulating her RFC because he:

> (1) improperly found that Young's depression was not a
> severe impairment, Admin. R. 10; Cl. Br. 2-11,
>
> (2) improperly assessed her credibility, rendering his
> RFC determination flawed, <u>see</u> Admin. R. 12; Cl. Br. 12;
> <u>see</u> <u>generally</u> SSR 96-7p, 1996 WL 374186 (July 2, 1996),
>
> (3) improperly assigned greater weight to the opinions
> of non-examining physicians, and did not grant
> controlling weight to her treating physician's
> functional capacity assessment, <u>see</u> <u>generally</u> 20 C.F.R.
> §§ 404.1502, 404.1527(d); SSR 96-2p, 1996 WL 374188
> (July 2, 1996), and
>
> (4) did not properly consider the impact of her obesity
> on her ability to work.  <u>See</u> <u>generally</u> SSR 02-1p, 2002
> WL 34686281 (Sept. 12, 2002).

The Commissioner asserts that the ALJ's findings are supported by

substantial evidence in the record, and moves for an order

affirming his decision.[3]  This court has subject-matter

jurisdiction under 28 U.S.C. § 1331 (federal question) and 42

U.S.C. § 405(g) (Social Security).

After a review of the administrative record, the court

concludes that the ALJ properly determined Young's impairments

---

[3]The Decision Review Board, <u>see</u> <u>generally</u> 20 C.F.R. §
405.401, did not complete its review of the ALJ's denial in a
timely fashion, Admin. R. 1, rendering the ALJ's order a final
decision of the Commissioner appealable to this court.  <u>See</u> 20
C.F.R. § 405.415.

and RFC, and therefore grants the Commissioner's motion and denies Young's motion.

I.   **APPLICABLE LEGAL STANDARD**

The court's review under Section 405(g) is "limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999); see Simmons v. Astrue, 736 F. Supp. 2d 391, 399 (D.N.H. 2010).  If the ALJ's factual findings are supported by substantial evidence in the record, they are conclusive, even if the Court does not agree with the ALJ's decision and other evidence supports a contrary conclusion. See Tsarelka v. Sec'y of Health & Human Servs., 842 F.2d 529, 535 (1st Cir. 1988).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quotations omitted).  The ALJ is responsible for determining issues of credibility, resolving conflicting evidence, and drawing inferences from the evidence in the record.  See Rodriquez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Pires v. Astrue, 553 F. Supp. 2d 15, 21 (D. Mass. 2008) ("resolution of conflicts in the evidence or questions of credibility is outside the court's purview, and thus

3

where the record supports more than one outcome, the ALJ's view prevails").  The ALJ's findings are not conclusive, however, if they were "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen, 172 F.3d at 35. If the ALJ made a legal or factual error, the decision may be reversed and remanded to consider new, material evidence, or to apply the correct legal standard.  Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16, 19 (1st Cir. 1996); see 42 U.S.C. § 405(g).


## II.  **BACKGROUND**

Pursuant to this court's local rules, the parties filed a Joint Statement of Material Facts (document number 11), which is part of the record reviewed by the court.  See LR 9.1(d). This court will briefly recount the key facts and otherwise incorporates the parties' joint statement by reference.

Young filed an application for Disability Insurance Benefits in April 2008 claiming she became disabled in August 2004[4] due to depression, diabetes,[5] high cholesterol, and high

---

[4]Young's onset date was later amended to April 2007.  Admin. R. 23.

[5]Diabetes is "a chronic syndrome of impaired carbohydrate, protein, and fat metabolism owing to insufficient secretion of insulin or to target tissue insulin resistance.  It occurs in two

blood pressure.  See Admin. R. 106-10. Her application for
benefits was denied in November 2008,[6] see id. at 46, 48, because
it was determined that although Young suffered from diabetes, it
"is under good control," and likewise her high blood pressure "is
treated with medication" and there was no evidence that her
cholesterol problems caused any heart disease.  See id. at 48.
The SSA also determined that although Young had shown symptoms of
anxiety and depression, based on a recent psychiatric evaluation,
Young was still capable of performing her prior work as a daycare
assistant "despite any impairment." Id.  Young appealed that
decision to the ALJ, id. at 54-56; see generally 20 C.F.R. §
405.301, who, after a hearing in March 2010, concluded that Young
was capable of returning to her prior work and thus not entitled
to benefits.  Admin. R. 7-15; see generally 20 C.F.R. §
404.1520(a)(4)(iv).

_____

major forms:  *type 1 d. mellitus* and *type 2 d. mellitus*, which
differ in etiology, pathology, genetics, age of onset, and
treatment." Dorland's Illustrated Medical Dictionary, 513 (31st
ed. 2007) (emphasis in original).

   [6]It appears from the record that the SSA initially concluded
in October 2008 that Young was disabled, see id. at 47, 148-152,
but that determination was revised after an internal review of
Young's medical records.  See id. at 148 ("Report of Contact"
dated 10/17/08), 149-51 ("Request for Corrective Action"  dated
11/10/08), 152 ("Report of Contact" dated 11/18/08).

The ALJ did determine that Young was physically severely impaired due to diabetes and obesity.  Admin. R. 9; see generally 20 C.F.R. § 404.1520(a)(4)(ii).  He specifically found, however, that Young's "medically determinable mental impairment of depression did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and was therefore nonsevere."  Admin. R. 10.  The ALJ denied benefits because he concluded that despite her impairments, Young had the RFC "to perform light work[7] . . .  except she has the ability to occasionally climb, crouch, crawl, bend, stoop, and kneel.  She will have a slightly higher . . . number than usual interruptions to pace and will work at a slightly slower pace, but this would not be to the point of unreasonable for the job setting."  Admin. R. 11; see generally, 20 C.F.R. § 404.1520(a)(4)(iv).  The ALJ concluded that given this RFC, Young was able to perform her past work as "a companion, daycare assistant, and teacher's assistant," and was therefore not disabled.  Admin. R. 15; see generally, 20 C.F.R. § 404.1520(a)(4)(iv).

---

[7]Light work is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).

The ALJ's RFC analysis necessarily required consideration of medical evidence regarding the limiting effects of Young's anxiety and depression and the functional challenges arising from her diabetes and obesity.  See generally, Manso-Pizarro, 76 F.3d at 17.  Young testified that she had been battling depression since 1997, Admin. R. 26, was diagnosed with diabetes, id., see also id. at 219-37 (hospital notes from emergency admission for diabetes), and was obese, weighing over 320 pounds at the time of the hearing.  Id. at 31.  Prior to the hearing, a number of physical and mental functional evaluations from six different physicians were submitted to the ALJ for consideration.  There were substantial conflicts in these evaluations:  one was revised by its author, and each was based on varying pieces of evidence. The ALJ was required to weigh this opinion evidence in formulating Young's RFC, see generally 20 C.F.R. § 404.1527; Part III-C, infra., as such, each evaluation will be summarized at the outset.

Young was sent by the SSA to Dr. M. Lorene Snipes, Ph.D., for a psychological evaluation in September 2008.  Admin. R. 273. Dr. Snipes diagnosed Young with a major depressive disorder, single episode, and a panic disorder without agoraphobia.  Id. at 276.  Dr. Snipes concluded that Young could understand simple oral and written instructions, cope with the social demands of a

7

work environment, and manage her daily living and personal financial affairs.  Dr. Snipes determined, however, that Young could not concentrate and complete certain work related tasks and would be unable to adjust to most common work situations.  Id. at 275-76.  Her conclusion that Young had concentration issues was based on an apparent inability to spell her own name backwards. Id. at 275.

There were, however, some concrete factual errors in Dr. Snipes' report.  Dr. Snipes described Young as "African-American," id. at 273, yet Young testified that she is not, id. at 38, and her attorney stated that this notation by Dr. Snipes "didn't make sense to me."  Id.  The ALJ then observed, "[m]y guess is whoever did [the evaluation] wrote the wrong person," and Young's attorney replied, "I think so."  Id. at 39.  Further, Dr. Snipes described Young as being "of average height and weight."  Id. at 274.  Medical records from a few months earlier, however, showed that Young weighed 294 pounds and had a Body Mass Index ("BMI") of 48.[8]  Admin. R. 360.  There was never any

_____

[8]BMI is a measurement based on a subject's height and weight and is used to roughly determine a patient's body fat.  A BMI over 30 indicates that the patient is obese and at high risk for obesity related diseases.  See Centers for Disease Control and Prevention, Healthy Weight (2011), http://www.cdc.gov/healthy weight.

allegation nor record evidence that Young sustained massive weight loss any time that year.

Young's medical records were subsequently evaluated by Dr. Craig Stenslie, Ph.D. on October 14, 2008. See id. at 286-88, 305-17. Dr. Stenslie completed both a Psychiatric Review, id. at 305-317, and a Mental RFC Assessment. Id. at 286-88. He did not examine Young, and instead reviewed Young's medical records. Dr. Stenslie noted that although there were medical records showing treatment for depression in 2000-2002, there was "nothing more recent of any substance." Id. at 288. He concluded, however, that Young's allegations of disabling depression "are deemed essentially credible" and that she "is not able to maintain attention consistently for two hours and is not able consistently to deal adequately with change even in a low stress environment." Id. Dr. Stenslie found that Young had "marked" limitations in maintaining concentration, persistence, and pace. Id. at 315. Dr. Stenslie made these observations based primarily on Dr. Snipes's consultative evaluation, noting, "Dr. Snipes' opinions are given significant weight and appear to be based adequately in the data." Id. at 288.

Dr. Burton Nault, M.D. completed a physical residual functional capacity assessment on October 2008 based on Young's medical records. He noted that although none of her treating

9

physicians had completed such physical RFC review, in his
opinion, Young was physically capable of performing light work.
Id. at 290-97.  His analysis was brief, but was based on medical
records indicating that Young's diabetes was "under better
control," tests showed "no acute cardiopulmonary process," and
Young's self reported ability to "[do] light housework, cook[]
simple meals, and drive[].  [Young] states she can walk about one
block at a time."  Id. at 297.  He did note, however, that
Young's DIB benefits would be "[allowed] as of 6/1/08 for issues
not addressed in this RFC," presumably Young's mental
limitations.  Id.

     Psychiatrist Dr. G.R. Ibarra completed a "Medical
Consultant's Review of Psychiatric Review Technique Form" on
October 29, 2008, critiquing Dr. Stenslie's and Dr. Snipes'
psychiatric assessment of Young's mental functional capacity.
Id. at 298-302.  Dr. Ibarra disagreed with their opinion of
Young's concentration, persistence, and pace, and the level of
her decompensation due to depression and anxiety.  Dr. Ibarra was
highly critical of their reports, noting that medical records
concerning Young's depression showed "a depression that readily
responded to treatment."  Id. at 301.  Dr. Ibarra stated that
"[t]he idea that [Young] would not be able to work because her

10

concentration is impaired . . . is not tenable." Id.  In

particular, Dr. Ibarra noted that Young managed a

> very complex medical regime; to follow this medical
> regime will be taxing to anybody's attention,
> concentration and persistence.  [Young] is taking 10
> different medications with irregular schedules.  She
> needs to measure her glucose and calculate medication
> adjustments accordingly.  This demonstrates [an]
> ability to follow complex written instructions.  She
> reads as one of her past-times and states . . . she is
> able to sustain attention for 30 [minutes], well within
> the average.  She reads as a [hobby], an ungrateful
> task if there is faulty attention and concentration.

Id.  Dr. Ibarra concluded that "[i]t is not correct that her

daily routine is unstructured."  Id.

Dr. Stenslie subsequently revised his opinion and completed

a new Psychiatric Review form and Mental RFC assessment on

November 18, 2008.[9]  Admin. R. 324-40.  In his revised analysis,

Dr. Stenslie found only mild or moderate limitations,[10] and he

concluded that Young "is able to complete a normal workday and

workweek with a slightly higher than usual number of

interruptions to pace and a bit more slowly than usual . . . ."

_____

[9]The parties agree that this apparent change of heart came
after Dr. Stenslie reviewed Dr. Ibarra's critique.  Joint
Statement of Material Facts (document no. 11) at 12.

[10]He concluded that Young displayed a mild limitation in
daily living and moderate limitations in social functioning and
maintaining concentration, persistence, pace, and an ability to
maintain a regular schedule.  Admin. R. 334, 338-39.

Id. at 340.  Dr. Stenslie's opinion of Dr. Snipes' review changed dramatically, however, as he reported:

> Dr. Snipes finds intact memory but opines significant
> impairment of attention and concentration . . .
> although other tests of sensorium functioning[11] are
> intact - rendering [Dr. Snipes] later conclusion that
> [Young] is not able to attend to task[s] adequately to
> be erroneous and not based on the evidence. . . .
> [M]uch of Dr. Snipes report is not based adequately in
> the actual data and several of her conclusions . . .
> are refuted on the basis of the actual data.  The
> claimant's allegations are deemed only partially
> credible . . . .

Id.

Dr. Nault's physical functional capacity evaluation was also subjected to peer review.  On October 30, 2008, Dr. Michael Perll reviewed Dr. Nault's assessment and disagreed with Dr. Nault's analysis of Young's exertional and postural limitations.  Id. at 319-21.  Dr. Perll opined that none of Young's impairments were severe, as her records revealed no "end organ damage" or cardiac disease.  Dr. Perll noted that although Young's BMI was high, "there is no x-ray or physical evidence of any joint or spine problems due to her obesity."  Id. at 321.

Finally, on March 9, 2010, well after Young's claim had been denied and a few weeks before her hearing before the ALJ, Dr.

---

[11]"Sensorium" relates to "the condition of a subject relative to the subject's consciousness or mental clarity."  Dorland's Illustrated Medical Dictionary, 1718 (31st ed. 2007).

William Windler, M.D., completed an assessment of Young's
physical functional capabilities.  Id. at 418-423.  Dr. Windler
concluded that Young was unable to work at all, could lift less
that 10 pounds occasionally and frequently, could stand and walk
less than 2 hours per day, sit for less than 2 hours per day,
given, inter alia, back, ankle, and knee pain, obesity, decreased
sensation in her feet, and ankle swelling.  Id.  Dr. Windler also
noted "chronic significant depression . . . [and] panic attacks
. . . highly limit her. . . . Morbid obesity [and] likely
restrictive lung disease . . . severely limits [Young's] general
physical capacity."  Id. at 423.

The ALJ, after specifically reviewing the objective medical
evidence,[12] considered each of these opinions and assigned
varying weight to each.  Id. at 13-14; see generally 20 C.F.R. §§
404.1527 (c)(2), (d).  The AlJ gave "great" or "significant"
weight to Dr. Stenslie's revised evaluation and the evaluation of

---

[12]In particular, the ALJ noted that although there was
medical record evidence of a few episodic (and in part unrelated
to diabetic neuropathy or obesity) reports of numbness in her
feet and back pain, her diabetes was noted to be "well-
controlled."  The AlJ noted multiple observations by providers
that Young had a "normal gait and station."  Depression was
reported only occasionally, and daily fatigue was reported to be
"due to a poor sleeping pattern."  Id. at 12-13.  The ALJ thus
observed that the limitations described by Young "are not
substantiated by similar complaints at office visits.  As
recently as August 2009 [Young] reported no concerns at an office
visit."  Id. at 13.

Dr. Ibarra, because he concluded that their opinions were supported by and consistent with the evidence of record.  Admin. R. 13-14.  Dr. Nault's opinion was only given some weight; the ALJ did not adopt Dr. Nault's indication that the claim should be allowed because of Young's mental health issues "because it was rendered prior to Dr. Stenslie's revised opinion after his further review of the evidence."  Id. at 13.  Dr. Perll's opinion was only given some weight because the ALJ concluded that Young's "obesity and diabetes mellitus do rise to the level of severe impairment, as demonstrated by the medical record."  Id. at 14.

Dr. Windler's opinion was given "little weight."  The ALJ stated that "[t]he record does not reflect complaints commensurate with [Dr. Windler's assessed] limitations.  Further, although he is a treating physician, his opinion is not supported by his own treatment notes."  Id.

Finally, Dr. Snipes's opinion was given "no weight."  The AlJ observed that there were some glaring factual errors in the evaluation and noted the same logical criticisms as Dr. Ibarra. The ALJ concluded that "Dr. Snipes' opinion is not entirely consistent with the record or her own notes . . . ."  Id.

The AlJ therefore concluded that Young's

impairments do not preclude performance of a range of
work at the light exertional level with limitations

14

> . . . . [Young] relies heavily upon allegations of
> physical limitations and fatigue.  These complaints are
> not well-documented in the medical records.  She
> manages to live on her own, prepares her own meals, and
> performs self-care adequately.  Her diabetes is well-
> controlled with no mention of any neuropathy, save for
> one isolated mention.  She does suffer from body aches
> and pains, along with weight gain and obesity; these do
> not, however, prevent her from performing her
> activities of daily living and are similarly consistent
> with [a light exertional] residual functional capacity.

Id. at 13.  The ALJ ruled, based on the testimony of a vocational
expert, that Young was capable of performing her prior work as a
day care assistant, companion, and teacher's assistant, and was
therefore not disabled.  Id. at 15.  After the Decision Review
Board failed to review the matter in a timely basis, see
generally, 20 C.F.R. § 405.415, this appeal followed.


## III. **ANALYSIS**

A five-step process is used to evaluate an application for
social security benefits.  20 C.F.R. § 404.1520(a)(4).  The
applicant bears the burden through the first four steps to show
that she is disabled.[13]  Freeman v. Barnhart, 274 F.3d 606, 608

---

[13]Specifically, the claimant must show that:  (1) she is not
engaged in substantial gainful activity; (2) she has a severe
impairment; (3) the impairment meets or equals a specific
impairment listed in the Social Security regulations; or (4) the
impairment prevents or prevented her from performing past
relevant work.  The Social Security Act defines disability as the
"inability to engage in any substantial gainful activity by
reason of any medically determinable physical or mental

(1st Cir. 2001).  At the fifth step, the Commissioner bears the burden of showing that a claimant has the residual functional capacity to perform other work that may exist in the national economy.  Id.; see also 20 C.F.R. § 404.1520(a)(4)(v); Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991).  The ALJ's conclusions at steps four and five are informed by his assessment of a claimant's RFC, which is a description of the kind of work that the claimant is able to perform despite her impairments.  20 C.F.R. §§ 404.1520(a)(4), 404.1545.

## A. Mental impairments

Young first asserts that the ALJ erred when he concluded at Step 2 that her mental impairments were not severe.  Cl. Brief 2. At Step 2, an ALJ determines the "medical severity of [a claimant's] impairment(s)" and will deny any claim if an impairment, or set of impairments is not "severe."  20 C.F.R. § 404.1520(a)(4)(ii).  Impairments are deemed "severe" if they "significantly limit[] [the] physical or mental ability to do basic work activities."  Id. § 404.1520(c).

---

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C.A. § 423(d)(1)(A).

The regulations describe the method an ALJ uses to assess a
claimed mental impairment.  20 C.F.R. § 404.1520a(a).  In
determining that a claimant suffers from a mental impairment, an
ALJ must make a specific finding as to the degree of limitation
in each of four functional areas.  20 C.F.R. § 404.1520a(c)(3);
see generally Negron v. Astrue, No. 09-1685(JAF), 2010 WL
1728331, at *3 (D.P.R. April 27, 2010).  The ALJ rates the degree
of limitation in:  (1) activities of daily living, (2) social
functioning, (3) concentration, persistence, or pace, and (4)
episodes of decompensation.  20 C.F.R. § 404.1520a(c)(3).  If the
ALJ rates the limitation in the first three areas as none or
mild, and in the fourth area as none, the ALJ will likely
conclude that the impairment is not severe.  20 C.F.R. §
404.1520a(d)(1).  "The claimant bears the burden of proof at Step
2, although it is a de minimis burden, designed to do no more
than screen out groundless claims."  LaBonte v. Astrue, No. 09-
358-P-S, 2010 WL 2024895, at *2 (D. Me. May 18, 2010).

Young asserts that "[a]s demonstrated by [Young's] testimony
. . . her depression, anxiety and panic attacks have more than a
mild effect on [Young's] ability to adequately engage in [the]
activities of daily living."  Cl. Br. 8.  The ALJ found only a
mild impact on her daily living, because "[t]he claimant
testified that she lives alone, prepares simple meals, and

17

completes household chores." Admin. R. 10.  Young's claim of
error, therefore, appears to be comprised primarily of the
argument that the ALJ erred because he failed to infer more than
a mild limitation from the record.  The ALJ is responsible for
resolving conflicts in the evidence, and as such, his conclusions
will be upheld if supported by the record.  Cf. Rodriguez, 647
F.2d at 222 (ALJ is responsible for resolving conflicts and
drawing inferences from the evidence in the record).  The ALJ
could properly conclude that her mental impairments had only a
mild effect on daily life.  The ALJ is directed to evaluate the
four functional areas and "rate the degree of [a claimant's]
functional limitation based on the extent to which [the
claimant's] impairment(s) interfere with [his or her] ability to
function independently, appropriately, effectively, and on a
sustained basis."  20 C.F.R. § 404.1520a(c)(2).  Although Young
desires the ALJ to judge her anxiety and depression as presenting
more than a mild limitation, the ALJ could reasonably conclude
that because she was able to complete self care, manage finances,
cook simple meals, live independently, and balance her daily
medications, her ability to manage daily life was not severely
impaired.  Indeed, Dr. Stenslie, in both his reports, concluded

that she had only a mild limitation in her daily activities.[14]
Admin. R. 315, 334.  Finally, numerous objective medical records
noted an absence of mental health issues, with Young denying any
"problems with depression or anxiety."  <u>Id.</u> at 359; <u>see</u> <u>also</u> <u>id.</u>
at 350, 368.

Additionally, Young contends that the ALJ had a duty to re-
contact Dr. Snipes because of the inconsistencies in her report.
Neither the regulations nor the facts of this case required the
ALJ to re-contact Dr. Snipes.  The re-contact requirement is
triggered "[w]hen the evidence we receive from your treating
physician or psychologist or other medical source is inadequate
for us to determine whether you are disabled."  20 C.F.R. §
404.1512(e).  If, however, there is sufficient record evidence
to resolve the claim, the ALJ is under no obligation to re-
contact a medical source.  <u>Anderson v. Astrue</u>, 682 F. Supp. 2d,
89, 96 (D. Mass. 2010); <u>see</u>, <u>e.g.</u>, <u>Shaw v. Sec'y of Health &</u>
<u>Human Servs.</u>, 25 F.3d 1037 (table decision), No. 93-2173, 1994 WL
251000, at *5 (1st Cir. June 9, 1994) (finding that ALJ did not
err in failing to re-contact claimant's treating physician when

---

[14]Even Dr. Snipes, noting activities in line with Young's
function report, <u>see</u> Admin. R. at 275; <u>see</u> <u>also</u> <u>id.</u> at 138-45
(self report), opined that "Ms. Young currently lives alone and
is able to independently complete adaptive daily living skills."
<u>Id.</u> at 275.

the record supplied an adequate evidentiary basis for his

decision); cf. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007)

(noting that the re-contacting of a treating physician is

required if the evidence is inadequate to determine disability).

In this case, there was ample other evidence on which the ALJ

could base his decision, and thus the re-contact requirement was

not triggered.[15]   Accordingly, no error occurred at Step 2.[16]

---

[15]Young asserts that the ALJ erred because although he
assigned great weight to the evaluation of Dr. Ibarra (concluding
that Young's mental impairments provided only moderate
limitations and were not disabling), the ALJ did not adopt Dr.
Ibarra's implicit Step 2 opinion that her mental limitations were
severe.  Cl. Br. 10.  An ALJ must rely to some degree on
evaluations from a physician or another expert.  This does not
mean, however, "that there must always be some super-evaluator, a
single physician who gives the factfinder an overview of the
entire case."  Evangelista v. Sec'y of Health & Human Servs., 826
F.2d 136, 144 (1st Cir. 1987).  That premise "is unsupported by
the statutory scheme, . . . case law, or by common sense, for
that matter."  Id.  Rather, "an ALJ is entitled to piece together
the relevant medical facts from the findings and opinions of
multiple physicians."  Mulkerron v. Astrue, No. 09-10998-RGS,
2010 WL 2790463, at *9 (D. Mass. July 15, 2010) (quotations
omitted).  Here, there was ample record support for the ALJ's
severity and RFC findings, and as such, there is no error.

[16]Young initially did not argue that failure to find her
mental impairments severe somehow compromised the ALJ's
determination of her RFC.  Cf. Delafontaine v. Astrue, No. 1:10-
cv-027, 2011 WL 53084, at *7-*8 (D.N.H. Jan. 7, 2011).  The
record shows that the ALJ did consider Young's mental impairments
when fashioning an RFC, and indeed placed limitations on her
ability to perform light work.  Admin. R. 11, 13-14; see
generally, SSR 96-8p, 1996 WL 374184, at *5; 20 C.F.R.
§ 404.1545(a)(2), (all impairments, both severe and non-severe
are considered in assessing a claimant's RFC).  Cf. Lalime, 2009
WL 995575, at *8 (no error in not listing obesity as an

**B. Credibility determination - daily activities**

Young next asserts that "the findings made by the ALJ regarding [Young's] performance of household chores is incorrect and unsupported by the evidence," Cl. Br. 12-15, and therefore

---

impairment when it was specifically considered in the RFC assessment); see generally, Portorreal v. Astrue, No. CA 07-296ML, 2008 WL 4681636, at *3-*4 (D.R.I. Oct. 21, 2008).

The parties, in dueling reply briefs, skirmished over whether the ALJ's decision not to find Young's mental impairments "severe" constituted harmless error because those impairments were later considered by the ALJ when formulating Young's RFC. See 20 C.F.R. § 404.1545(a)(2) (all impairments, even those not deemed "severe," are to be considered when formulating RFC); see generally, Maziarz v. Sec'y of Health & Human Servs., 837 F.2d 240, 244 (6th Cir. 1987) (since ALJ required to consider all impairments whether or not severe in formulating RFC, once a single severe impairment has been found, failure to find another particular impairment severe "could not constitute reversible error"); Vining v. Astrue, 720 F. Supp. 2d 126, 132 (D. Me. 2010) (because ALJ adopted an RFC assessment accounting for condition, there was no error in failure to find that condition severe at Step 2). Both parties frame their arguments asking whether it is appropriate for a court to employ a "harmless error" analysis when reviewing alleged error in an administrative decision. See generally, Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69 (1962); Robinson v. Barnhart, 366 F.3d 1078, 1084-85 (1th Cir. 2004) (AlJ's decision should be evaluated solely on reasons stated in decision); cf. Kurzon v. U.S. Postal Serv., 539 F.2d 788, 793 (1st Cir. 1976) (court will accept less than ideal clarity in administrative finding "if the agency's path may reasonably be discerned" (quotations omitted)). The court need not reach this issue, as it has concluded that there was no error. Further, given the structure of the regulations, where once an ALJ has concluded that a claimant has at least one "severe impairment" at Step 2, all medically determinable impairments are considered in formulating an RFC for purposes of Step 4 and Step 5, it appears that "harmless error" in the traditional sense is not a relevant inquiry.

21

the ALJ's conclusion that "[n]either [Young's] activities of daily living nor the objective medical evidence supports a finding of disability," Admin. R. 12, is erroneous.  She argues that her daily activities were limited in nature, required frequent rest, and thus did not support the determination that she was capable of sustained effort in a competitive environment. See generally 20 C.F.R. § 404.1572.

Standing alone, the ability to perform basic household tasks does not equate with an ability to perform substantial gainful activity.  See generally id.  "When evaluating the subjective claims of pain it is proper and, indeed, required that the ALJ consider daily activities such as driving, walking and household chores.  This allows the Secretary to juxtapose the claimant's subjective allegations of pain with the relative intensity of [her] daily regimen."  St. Pierre v. Shalala, No. CV-94-232-JD, 1995 WL 515515, at *3 (D.N.H. May 25, 1995) (citations omitted). "To be found disabled, a claimant must show that [she] cannot perform 'substantial gainful activity,'[17] not that [she] is totally incapacitated."  Id. (quotations omitted).  Daily

---

[17]"Substantial gainful activity" means an ability to "perform substantial services with reasonable regularity either in competitive or self-employment."  Blake v. Apfel, No. 99-126-B, 2000 WL 1466128, at *8 (D.N.H. Jan. 28, 2000) (quotations omitted).

22

activity evidence is used to "assist the Secretary in understanding the relationship between the medically determinable impairment, the alleged pain, and the [claimant's] ability to work." St. Pierre, 1995 WL 515515, at *4.

"While a claimant's performance of household chores and the like ought not to be equated to an ability to participate effectively in the workforce, evidence of daily activities can be used to support a negative credibility finding." Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010). The ALJ's "credibility determination - based on observations of the claimant, evaluation of her demeanor, and consideration of how her testimony fits in with the record evidence - is entitled to deference, especially when supported by specific findings." Id.

A review of the entire record reveals ample support for the ALJ's conclusion that Young's daily activity level was consistent with an ability to perform light duty work.[18] The ALJ correctly noted that Young reported that she:

> lives alone. In a typical day, she gets up in the late morning, watches television and the news, performs household chores, watches her diet, and prepares meals.

---

[18]Although Young urges the court to view daily activity evidence as supportive of disability, "a court must affirm the Commissioner's decision so long as it is supported by substantial evidence, even if the record could arguably justify a different result." Divirgilio v. Apfel, 21 F. Supp. 2d 76, 77 (D. Mass. 1998).

> She is able to read, watch television, go to
> appointments as needed, sit on the porch, and go for
> walks.  She reported walking a few days per week.
> These activities are inconsistent with a finding of
> disability as they indicate that the claimant maintains
> a full range of activities that are consistent with [an
> ability to perform limited light work].

Admin. R. 12 (citations omitted).  Further, the ALJ noted that

Young "manages to take her medications so that her diabetes is

well-controlled, which suggests that she is in control of her

faculties and can maintain a schedule."  Id. at 13.  The record

supports the ALJ's specific findings and the functional

inferences drawn from them were valid.  While Young complained at

the hearing that her medication makes her tired, Admin. R. 37,

the record reveals that during at least one doctor's visit, she

attributed fatigue to a lack of sleep unrelated to objective

physiological challenges.[19]  Id. at 394, 398.  Moreover, during

many regular check-ups at the Manchester Community Health Center,

she reported exercising multiple times per week, if not daily.

Id. at 344, 370, 372.  During multiple follow-up appointments,

providers observed stated that she had her diabetes under control

and she exhibited a normal mental status.  Id. at 242-43, 350,

368, 370, 382, 395-97, 408-10.  Although Young argues that the

---

[19]The medical reports contradict Young's self generated
function report, where she stated that due to her illness, she
took afternoon naps, id. at 139, and that it caused her to
frequently be awake at night.  Id.

ALJ should have found that her reported daily activities support a disability finding, "[t]hat [Young] claims to have had assistance . . . in completing the household work and that she often takes breaks does not prevent the hearing officer from using the testimony of [Young's] daily activities as one factor in assessing credibility." Teixeira, 755 F. Supp. 2d at 347, citing Rogers v. Barnhart, 204 F. Supp. 2d 885, 894 (W.D.N.C. 2002) (daily activity evidence supported credibility finding even though claimant testified that she had assistance and performed activities at a slower pace).[20]

Because there was record support for the ALJ's conclusion that Young's description of the limiting effects of her conditions was not credible, there was no error.[21]

---

[20]Indeed, it should be noted that Young's allegations were credited to some degree as the ALJ specifically limited her functional capacity to light work performed with a "slightly higher" than usual number of interruptions and a "slightly slower pace." Admin. R. 11.

[21]Young, citing several pieces of evidence, also contends that the ALJ ignored medical evidence when assessing her credibility. Most of the instances cited were either episodic and later resolved, or based on self reports by Young. See Admin. R. 219, 345, 347, 371, 374, 381-82, 389, 398, 412, 419, 422. More importantly, the evidence was contradicted by other substantial medical evidence on the record, including objective findings by health professionals, contradictory reports by Young herself, and mental health reviews by medical professionals. See id. at 242, 243, 344-45, 349-350, 359-60, 368, 370-72, 373-74, 387, 394-95, 397, 398, 408-09, 415, 416; cf. id. at 381-82 (Young complains of anxiety, but is observed to have "no depression,

**C. Treating and non-treating physicians**

Young next asserts that the ALJ erroneously assigned weight to various physician's evaluations of her mental and physical functional capacities.  In particular, Young faults the ALJ for granting great weight to the opinion of Dr. Nault, and refusing to grant controlling weight to the opinion of "treating physician," Dr. Windler.  Cl. Br. 18-20.

In a step four analysis, the ALJ, having already determined that the claimant suffers a severe impairment, makes a determination of the claimant's current functional capacity, or RFC.  If the RFC finding is supported by substantial evidence in the record, it is conclusive.  <u>Nguyen</u>, 172 F.3d at 35.  Findings

---

anxiety, or agitation").  Indeed, her chief complaint that the ALJ ignored medical notations that she suffered from depression and anxiety, Cl. Br. 16, is contradicted by other objective evidence that her mental status examinations were generally normal and that Young, in both April and August 2009, denied she was depressed and that her mood had improved.  <u>Id.</u> at 243, 350, 359, 368, 395; <u>see</u> <u>also</u> <u>id.</u> at 415 (Young reports she occasionally has "periods of depression").  As such, Young's argument appears to fault the ALJ for not resolving the conflicts in the evidence if her favor.  "[T]he First Circuit has held that an ALJ's written decision need not directly address every piece of evidence in the administrative record" if it is cumulative of evidence already discussed by the ALJ or fails to support the claimant's position.  <u>Lord v. Apfel</u>, 114 F. Supp. 2d 3, 13 (D.N.H. 2000).  Conflicts in the evidence are for the ALJ to resolve.  <u>Pires</u>, 553 F. Supp. 2d at 21.  It is not error for an ALJ to resolve those conflicts against a claimant, so long as there is substantial record support for his decision.  <u>See</u> <u>DiVirgilio</u>, 21 F. Supp. 2d at 77.

are not conclusive, however, "when derived by ignoring evidence,
misapplying the law, or judging matters entrusted to experts."
Id.

Determination of a claimant's RFC is an administrative
decision that is the responsibility of the Commissioner. See 20
C.F.R. § 404.1527(e)(2), SSR 96-5p, 1996 WL 374183, at *2 (July
2, 1996).  An ALJ is prohibited, however, from disregarding
relevant medical source opinions. See SSR 96-5p, 1996 WL 374183,
at *5.  Where an ALJ's RFC assessment is at odds with a medical
source opinion, he must explain his reasons for disregarding that
opinion. See 20 C.F.R. § 404.1527(d)(2); SSR 96-8p, 1996 WL
374184, at *7; Marshall v. Astrue, No. 08-cv-147-JD, 2008 WL
5396295, at *4 (D.N.H. Dec. 22, 2008) (reversing ALJ decision
because treating source opinion was "simply overlooked").

A "treating physician's opinion is generally afforded
controlling weight if it is well-supported by medically
acceptable clinical and laboratory diagnostic techniques and is
not inconsistent with other substantial evidence in the case
record." Lopes v. Barnhart, 372 F. Supp. 2d 185, 193-94 (D.
Mass. 2005) (quotations and brackets omitted); see generally SSR
No. 96-2p, 1996 WL 374188, at *1; Marshall, 2008 WL 5396295, at
*3; 20 C.F.R. § 404.1527(d)(2).  "The First Circuit has held

. . . that when a treating doctor's opinion is inconsistent with other substantial evidence in the record, the requirement of controlling weight does not apply." Rosario v. Apfel, 85 F. Supp. 2d 62, 67 (D. Mass. 2000) (quotations omitted).

When an ALJ decides not to give controlling weight, he is required to "give good reasons . . . for the weight [he] give[s] your treating source's opinion." 20 C.F.R. § 404.1527(d)(2). The "good reasons" requirement mandates that the ALJ's order "must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and reasons for that weight." SSR No. 96-2p, 1996 WL 374188, at *5.

Here, although the ALJ's discussion of the weight afforded Dr. Windler's opinion is not lengthy, the court finds no error.[22]

---

[22]On this record, the court wonders why the ALJ even considered Dr. Windler a treating physician. A "treating source" is defined as a medical source who provides a claimant

> with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. . . . We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment . . . *but solely on your need to obtain a report in support of your claim for disability.*

Significantly, the ALJ stated that Dr. Windler's opinion was "given little weight" because the severe restrictions imposed by Dr. Windler "are not consistent with the claimant's documented complaints and limitations in the record." Admin. R. 14. This conclusion is supported by both the ALJ's specific observations about the objective data and the medical evidence as a whole. Earlier in the order, the ALJ noted that the objective medical evidence did not support a finding of disability because she was

---

20 C.F.R. § 404.1502 (emphasis added); see generally SSR 96-2p, 1996 WL 374188. Dr. Windler is a physician in private practice in Manchester. The administrative record shows that Young was treated on multiple occasions for routine check-ups (primarily for her diabetes) and minor illnesses by another provider, the Manchester Community Health Center, from March 2008 through September 2009. Admin. R. 342-417. The first record evidence of an encounter with Dr. Windler is the physical evaluation dated March 9, 2010, shortly before the ALJ hearing. Id. at 20, 418. Indeed, the only treatment record from Dr. Windler indicates that the "reason for visit" was an "f.c.e.," presumably the acronym for a "functional capacity evaluation." Id. at 418; see generally id. at 418-23. During the hearing, Young was asked to name the physicians she sees to treat her diabetes and other illnesses. In response, she did not name Dr. Windler. Id. at 27-28. Moreover, Dr. Windler appears not to have prescribed a course of treatment for Young, casting further doubt on his status as a "treating physician." See Blanchette v. Astrue, No. 08-cv-349-SM, 2009 WL 1652276, at *7 (D.N.H. June 9, 2009) (fact that doctor failed to prescribe treatment bolstered ALJ's determination that supposed treating source limitations were unsupported by the medical evidence).

Thus, the court cannot fathom why Dr. Windler should be considered a treating physician whose opinion is entitled to controlling weight. See 20 C.F.R. § 404.1502 (defining treating source); see generally, SSR 96-2p, 1996 WL 374188.

observed "to have a normal gait and station," see id. at 12
(order), 243, 255, 350 (normal gait and station), and any
tingling or numbness inhibiting her ability to walk was not
attributable to diabetes or had only been the subject of an
isolated complaint.  Id. at 13 (order), 254-55 (edema upon first
office visit after release from hospital in April 2008 after new
diagnosis of diabetes), 394-97 (in August 2009 no finding of
edema or loss of sensation); 405 (in June 2009 Young reported
severe back and leg pain resulting from a fall).  Moreover, the
ALJ noted that in late 2009, Young reported having "no
concerns,"[23] and that any disabling fatigue was not due to
diabetes, rather Young attributed it to "a poor sleeping
pattern."  Admin. R. 13, 394; see also id. at 359 (Young denies
depression or anxiety, claims sleeplessness not due to anxiety);
387 (in late September 2009 Young reports feeling "fine," denies
any pain and has no concerns); 394 (in late August 2009, Young
denies any pain, reports fatigue is due to "a poor sleeping
pattern" and not diabetes); 395 (Young reports that she walks

_____

[23]Young made these positive reports to physicians during
routine health check-ups at the Manchester Community Health
Center where she was seen on a regular basis from at least March
2008 through September 28, 2009.  Although the ALJ stated that
this visit occurred in August 2009, a review of the exhibit cited
by the ALJ reveals that it in fact occurred a month later, on
September 28, 2009.  Admin. R. 387-88.

three times per week, is not depressed, and that her anxiety is
better).

In contrast, at a visit to Dr. Windler in March 2010,
shortly before the hearing with the ALJ, Dr. Windler noted
Young's morbid obesity and stated she had an antalgic gait.[24]
Admin. R. 419.  He noted that her mental status was normal.[25]
Id.; Joint Statement of Material Facts (document no. 11) at 9.
In an accompanying functional capacity evaluation opining that
Young was severely disabled, however, Dr. Windler stated as
supporting evidence that Young had chronic significant depression
"mostly" responsible for her limitations.  Id. at 423.  He also
noted that morbid obesity and likely restrictive lung disease
"severely limits general physical capacity."  Id.  Dr. Windler
also offered as support a history of back pain, tender knees and
left ankle, decreased sensation in her hands and feet, and
shoulder pain.  Id. at 421-22.

The ALJ did not err in giving little weight to Dr. Windler.
The record supports the ALJ's conclusion that the stated physical

---

[24]"Antalgic" is defined as counteracting or avoiding pain, as
a posture or gait assumed so as to lessen pain.  Dorland's
Illustrated Medical Dictionary, 2054 (31st ed. 2007).

[25]The court observes that Dr. Windler's office notes are
disorganized and barely legible.  As such, the court relies
heavily on the Joint Statement of Material Facts for clarity.

31

restrictions are not consistent with regular treatment notes pre-dating Young's visit to Dr. Windler.  Further, the ALJ's conclusion that Windler's own treatment notes do not support his conclusions is accurate.  Dr. Windler on one hand noted a normal mental status, id. at 419, but in his functional evaluation noted that chronic depression was most responsible for her limitations. Id. at 423.  Because the ALJ could properly conclude that Dr. Windler's opinion was unsupported by the bulk of the evidence, and in part internally inconsistent, the ALJ was not required to give Dr. Windler's opinion controlling weight.  See, e.g., Rosario, 85 F. Supp. 2d at 67.

The court also concludes that the ALJ did not improperly weigh non-treating physician Dr. Nault's opinion regarding Young's physical and mental capabilities.  Young contends that the ALJ erred because Dr. Nault's opinion was rendered before Dr. Windler examined Young, and that the ALJ's reasoning is insufficient.  The court disagrees.

Although determination of a claimant's RFC is an administrative decision that is the responsibility of the Commissioner, see 20 C.F.R. § 404.1527(e), SSR 96-5p, 1996 WL 374183, at *2, an ALJ, as a lay person, cannot interpret a claimant's medical records to determine his RFC.  Manso-Pizarro, 76 F.3d at 17.  Rather, "an ALJ is entitled to piece together the

32

relevant medical facts from the findings and opinions of multiple physicians." Mulkerron, 2010 WL 2790463, at *9 (quotations omitted).

> [T]he opinions of State agency medical . . .
> consultants can be given weight only insofar as they
> are supported by evidence in the case record,
> considering such factors as the supportability of the
> opinion in the evidence including any evidence . . .
> that was not before the State agency, [and] the
> consistency of the opinion with the record as a whole
> . . . .

SSR No. 96-6p, 1996 WL 374180, at *2 (July 2, 1996).

Thus, a court must determine whether the ALJ's evaluation of Dr. Nault's opinion is supported by the evidence. Because state agency physicians and consultants are experts in social security disability programs, their opinions on the nature and severity of a claimant's impairments cannot be ignored by an ALJ. See SSR No. 96-6p, 1996 WL 374180, at *2; see generally, 20 C.F.R. § 404.1527(f). "[T]he First Circuit explained [that] an advisory report of a non-examining, non-testifying physician is entitled to evidentiary weight, which will vary with the circumstances, including the nature of the illness and the information provided the expert." Reeves v. Barnhart, 263 F. Supp. 2d 154, 161 (D. Mass. 2003) (quotations omitted), see Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 431 (1st Cir. 1991). In this case there is ample record support for the ALJ's treatment

of Dr. Nault's opinion.  First, when formulating an RFC, an ALJ

looks at *all the medical and other relevant evidence* in the file.

See SSR No. 96-5p, 1996 WL 374183, at *4-*5.  Here, the ALJ

supported his RFC decision with multiple references to medical

findings and other evidence dated before and after the

assessments completed by Dr. Nault.  Moreover, the ALJ discussed

his reasons for weight attributed to the functional opinion of

six separate doctors, three of which were given greater weight.

The ALJ's decision to give only some weight to Dr. Nault's

mental health opinion is well founded.  The ALJ relied on the

fact that Dr. Nault based his mental health determination on Dr.

Stenslie's first evaluation.  As discussed supra, Dr. Stenslie's

first evaluation was suspect at best, because it rested on a very

flawed evaluation by Dr. Snipes.[26]

Similarly, the ALJ's decision to give Dr. Nault's opinion

regarding Young's physical capabilities great weight "because

they are consistent with and supported by the evidence of record"

was not error.  See Admin. R. 13.  Dr. Nault's stated reasons for

his conclusions, although not terribly lengthy, contained a

number of accurate citations to Young's medical records.  See id.

---

[26]Indeed, even counsel for Young noted at the hearing that
Dr. Snipes' evaluation probably involved a patient other than
Young.

at 297.  Dr. Nault's observations that despite Young's high
cholesterol and blood pressure she had no acute cardiopulmonary
issues, that her diabetes management had improved and was "under
better control," and that she was mobile, all supported his
conclusion that she could do light work.  See id.  Medical
records cited by Dr. Nault from the period following Young's
discharge from Eliot Hospital show that Young was managing her
diabetic condition, and had both full strength and intact
sensation.  See id. at 226-227.  Dr. Nault's physical capacity
determination was also supported by later developed evidence in
the file,[27] including multiple notations that she had a normal
gait and station, took walks multiple times per week, managed her
diabetes well, and reported during a routine exam that she had
"no issues."[28]  Indeed, Young's primary objection to Dr. Nault's
assessment is that it did not comport with that of Dr. Windler,
which was, as discussed supra, properly given little weight.  The

_____

[27]This evidence, while not specifically identified by the ALJ
during his discussion of the weight afforded Dr. Nault's opinion,
was discussed earlier in the ALJ's order, and it is reasonable to
assume that this recitation was the "record evidence" that the
ALJ stated supported Dr. Nault's opinion.

[28]Further, on multiple occasions medical providers noted that
Young exhibited full arm and leg strength.  See id. at 226, 243,
255.

court concludes, therefore, that the ALJ's opinion was supported by substantial evidence and there was no error.

### D. Obesity

Finally, Young asserts that the ALJ erred in his analysis of the impact of her morbid obesity on her ability to work.  Young asserts that "[g]iven the extreme nature of the plaintiff's obesity it is critical for the ALJ to consider its effects in a function by function analysis of the plaintiff's capacity to perform work related tasks . . . ."  Cl. Br. 24.  Although the ALJ did not perform an in-depth analysis of the functional effects of Young's obesity, the record shows that he properly considered it and committed no error.

The ALJ deemed Young's obesity a severe impairment.  Admin. R. 9.  Social Security Ruling 02-1p counsels that "[a]ssessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment . . .  As with any other impairment, [the SSA] will explain how [it] reached [its] conclusions on whether obesity caused any physical or mental limitations."  SSR 02-1p, 2002 WL 34686281, at *6-*7.  The ALJ specifically stated that he "considered the effects of the claimant's obesity on her other impairments."  Admin. R. 11.  He

observed that although obesity affects Young's "overall condition
. . . she remains fully weight bearing and does not have abnormal
neurological functioning." Id.  In his RFC analysis, the ALJ
found that obesity did not "prevent her from performing her
activities of daily living and [is] consistent with the above
residual functional capacity" assessment.  Id. at 13; Smith v.
Astrue, No. 06-11499-GAO, 2008 WL 4447007, at *4 (D. Mass. Sept.
30, 2008) (ALJ adequately considered obesity when he implicitly
addressed it in his RFC analysis and explicitly stated that his
analysis took it into account).

The ALJ's observation that despite her morbid obesity, Young
remains fully weight bearing is supported by numerous medical
records observing full leg strength, normal gait and carriage,
and a self reported ability to exercise multiple days per week.[29]
Id. at 226, 243, 255, 344, 350, 370, 372, 395.  The ALJ
specifically gave no weight to the opinion of Dr. Perll, who
opined that Young's obesity did not qualify as a severe
impairment.  Admin. R. 14.  Consequently, although the ALJ's
discussion was arguably brief, it was supported by record

_____

[29]Moreover, fatigue was not reported by Young to be, id. at
394, or tied by her physicians, to her obesity.  Id. at 398
(Young counseled about the stimulating effect of watching
television at night and told to stop taking daytime naps); cf.
SSR 02-1p, 2002 WL 34686281, at *6 (fatigue due to obesity often
limits work ability).

evidence and did "deliver on the promise made in Ruling 02-1p

that an explanation would be provided." Kennison v. Comm'r, No.

1:10-cv-00113-JAW, 2011 WL 1130887, at *3 (D. Me. March 25, 2011)

(ALJ did not "deliver on the promise," by failing to mention

obesity in RFC assessment); see, e.g., Smith, 2008 WL 4447007, at

*4; cf. Robles v. Barnhart, No. Civ.A. 04-11012-DPW, 2005 WL

1773963, at *6 (D. Mass. July 22, 2005) (ALJ adequately

considered morbid obesity when he "found no indiction in the

record of any significant functional limitation").

The court determines that Young's remaining allegations of

error are without merit because the record adequately supports

the ALJ's conclusions.[30]   See Irlanda Ortiz v. Sec'y of Health &

---

[30]For example, Young argues that the ALJ failed to properly
apply the so-called "Avery factors" used to evaluate a claimant's
subjective reports of pain.  See Avery v. Sec'y of Health & Human
Servs., 797 F.2d 19, 28-30 (1st Cir. 1986).  While detailed
written discussion of the Avery factors is preferred, see
Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195
(1st Cir. 1987), an ALJ may comply with Avery if he explores the
factors at the administrative hearing, see Forni v. Barnhart, No.
05-cv-406-PB, 2006 WL 2956293, at *10 (D.N.H. Oct. 17, 2006)
(Avery analysis sufficient even though express analysis was
cursory, where "searching review" of the record revealed that ALJ
reviewed Avery factors at the hearing); Lopes, 372 F. Supp. 2d at
192, so long as there is substantial evidence in the record to
support the ALJ's conclusions.  Pires, 553 F. Supp. 2d at 24.
Courts also have "ruled that no grounds existed for reversal when
the hearing officer omitted one factor, but adequately attended

to the other relevant factors." Conte v. McMahon, 472 F. Supp.
2d 39, 50 (D. Mass. 2007).

Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) ("We must uphold the Secretary's findings if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." (quotations and ellipses omitted)).

IV.   **CONCLUSION**

Pursuant to sentence four of 42 U.S.C. § 405(g), Young's motion to reverse and remand the Commissioner's decision[31] is denied.  The Commissioner's motion to affirm the decision[32] is granted.  The Clerk of Court is directed to enter judgment in accordance with this order and close the case.

---

The ALJ took testimony about most, if not all, of the Avery factors during the hearing, Admin. R. 29, 32, 35-38, and then recited that testimony in the narrative of his order.  Id. at 12. He found Young's statements regarding the intensity and limiting effects of her impairments to lack credibility.  He supported this conclusion with specific references to her testimony during the hearing, her reports to medical providers, and observations of her medical providers.  Id.  The record, which substantially supports the ALJ's notations, reveals no error.

[31]Document no. 8.

[32]Document no. 10.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:   September 15, 2011

cc:   Jeffry A. Schapira, Esq.
      Gretchen Leah Witt, Esq